IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| LEROY PRITCHARD; ANTHONY LEGARE; and STEVEN AUSTIN, on behalf of themselves and others similarly situated, | : | CIVIL ACTION |
| | : | |
| | : | FILED ELECTRONICALLY |
| Plaintiffs, | : | |
| v. | : | CLASS/COLLECTIVE |
| | : | ACTION |
| BIMBO BAKERIES USA, INC. and BIMBO FOODS BAKERIES DISTRIBUTION, LLC, | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |
| | : | |

## COMPLAINT-CLASS/COLLECTIVE ACTION

Plaintiffs Leroy Pritchard, Anthony Legare, and Steven Austin deliver food products to retail stores and other end users on behalf of Defendants Bimbo Bakeries USA, Inc. and Bimbo Foods Bakeries Distribution, LLC pursuant to form contracts like the one attached as Exhibit A.  In this "hybrid" class/collective action lawsuit, Plaintiffs allege that Defendants have: (i) failed to pay them overtime premium compensation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et. seq.; (ii) subjected them to improper pay deductions in violation of the Pennsylvania Wage Payment and Collection Law ("PWPCL"), 43 P.S. §§ 260.1, et seq.; (iii) breached the contracts by, *inter alia*, engaging in conduct that violates the duty of good faith and fair dealing inherent in

1

every Pennsylvania contract; and (iv) been unjustly enriched under Pennsylvania common law.  Plaintiffs seek all damages available under these legal theories.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over the FLSA claim pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

2.      This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

4.      Leroy Pritchard ("Pritchard") resides in Kingston, PA (Luzerne County).

5.      Anthony Legare ("Legare") resides in Exeter, PA (Luzerne County).

6.      Steven Austin ("Austin") resides in Wyoming, PA (Luzerne County).

7.      Pritchard, Legare, and Austin are referred to collectively as "Plaintiffs."

8.      Bimbo Bakeries USA, Inc. ("Bimbo USA") is a corporate entity headquartered in Horsham, PA (Montgomery County).

9.      Bimbo Foods Bakeries Distribution, LLC ("Bimbo Distribution") is a corporate entity headquartered in Horsham, PA (Montgomery County).

2

10.    Bimbo USA and Bimbo Distribution are referred to collectively as "Defendants."

11.    Defendants are engaged in commerce and, furthermore, employ individuals engaged in the production of goods for commerce and/or handling, selling, or working on goods or materials that have been moved in or produced in commerce.  As such, Defendants are covered by the FLSA.

## FACTS

12.    Defendants are in the business of manufacturing, distributing, and selling food products to grocery stores, restaurants, nursing homes, schools, and other end-users (collectively "Outlets") throughout the United States.

13.    In distributing their food products to Outlets, Defendants enter into standardized contracts with individual Distributors who, *inter alia*, deliver the food products to Outlets and perform basic merchandising tasks (e.g., stocking shelves) at the Outlets.  See, e.g., Exhibit A.  Under these contracts, Defendants are required to, *inter alia*, "USE COMMERCIALLY REASONABLE EFFORTS TO DELIVER TO DISTRIBUTOR SUFFICIENT QUANTITIES OF THE PRODUCTS TO SUPPLY OUTLETS REQUESTING SERVICE IN THE SALES AREA, TO ASSIST IN THE DEVELOPMENT OF THE NEW OUTLETS, TO PURSUE THE DEVELOPMENT OF THE NEW PRODUCTS, TO PRESERVE

3

AND DEVELOP THE QUALITY AND MARKETABILITY OF THE

PRODUCTS AND, TO ASSIST AND COOPERATE WITH THE

DISTRIBUTOR'S SALES EFFORTS . . . ." Id. at § 5.1.  Also, the contracts

require Defendants to use "COMMERCIALLY REASONABLE EFFORTS" to

negotiate with Outlets regarding, *inter alia*, product price and selection within the

Outlets.  See id. at § 5.2.

14.    The services performed by Plaintiffs and other Distributors are

integral to Defendants' business.  Indeed, Bimbo USA's website asserts that the

company "operates more than 60 bakeries, employs more than 22,000 associates

*and distributes products through 11,000 sales routes throughout the United*

*States*."  (emphasis supplied).

15.    Most Distributors work for Defendants on a long-term basis.  For

example: Pritchard has worked as a Distributor since approximately 2008; Legare

has worked as a Distributor since approximately 2013; and Austin has worked as a

Distributor since approximately 2005.

16.    Each of the three Plaintiffs paid over $100,000 to purchase their

routes.  Similar to most other Distributors, these purchases were financed through

loans facilitated by Defendants.

4

17.    Distributors are assigned to Depots where they pick-up the food products and report to supervisors.  Pritchard and Austin are assigned to the Dupont (a.k.a. Pittston) Depot.  Legare is assigned to the McAdoo (a.k.a. Hazleton) Depot.

18.    The Distributor position primarily consists of driving to and from Outlets, carrying food products into and out of Outlets, stocking and rearranging food items on store shelves, and following Defendants' various inventory control protocols and requirements.  As such, the position consists of basic skills that are easily learned through on-the-job training.  No special skills are required.

19.    The duties of Plaintiffs and other Distributors entail, in part, driving vehicles weighing less than 10,000 pounds.  For example, when visiting stores to perform "pack-outs," Pritchard and Austin drive pick-up trucks, and Legare drives a sedan.

20.    Defendants exert substantial control over the most basic aspects of the Distributors' work.  For example, Defendants:  unilaterally determine food item prices; unilaterally negotiate with Outlets concerning product prices, promotional programs, and other merchandising issues; require Distributors to stock store shelves pursuant to detailed "planograms" and other directives; unilaterally adjust food item orders; dictate the circumstances under which food items must be

5

removed from Outlets as "stale;" require Distributors to deliver food products to

unprofitable corporate accounts; require Distributors to participate in marketing

programs determined solely by Defendants; require Distributors to utilize

inventory control and record-keeping systems developed exclusively by

Defendants; and prohibit Distributors from delivering competitors' food products.

21.    Distributors are paid under a complicated system whereby they must

purchase food items from Defendants at prices unilaterally set by Defendants.  The

Distributors then owe Defendants the monies associated with these purchases,

creating a debit on their weekly compensation report.  Then, when the food

products are sold to the ultimate consumer (usually a store customer), the

Distributors receive a credit for the ultimate sale price plus a commission in the

range of 10-20% depending on the product.  This ultimate sale price is negotiated

between Defendants and the Outlet without any meaningful Distributor input.

22.    Utilizing the above compensation system, Defendants regularly

operate in a manner that unfairly diminishes the earnings and route valuations of

Plaintiffs and other Distributors.  For example, Defendants, acting without any

meaningful Distributor input:  (i) permit restaurants and other non-retail Outlets to

pay low sales prices on certain products that unjustifiably deflate Distributors'

earnings;  (ii) permit retail Outlets to run promotions and otherwise sell products to

retail customers at heavily discounted sales prices that deflate Distributors'

earnings;  (iii) fail to quickly and adequately fill orders for products that are in high

demand;  (iv) require Distributors to sell products to unprofitable "commercial"

Outlets;  (v) require Distributors to sell unpopular products that are likely to remain

unsold by the expiration date;  (vi) terminate the manufacture and/or distribution of

popular local brands in favor of national brands that generate fewer sales; and  (vii)

terminate the manufacture and distribution of "private label" brands that generate

significant sales.

    23.    Plaintiffs and other Distributors, pursuant to the Distributor

Agreements and other related documents, agree to permit Defendants to make

various deductions to their weekly pay.  See, e.g., Exhibit B (authorizing certain

"DEDUCTIONS").  For example, for the week ending November 12, 2016,

Defendants made the following deductions from Pritchard's weekly pay: (i) a

$439.30 deduction labeled "ADVANTAFIRST LOAN;"; (ii) a $44.85 deduction

labeled "ALLSTATE INSURANCE;"; (iii) a $5.00 deduction labeled

"COMMUNICATION CHARGE;" (iv) an $8.50 deduction labeled "HANDHELD

SUPPLIES;" and (v) a $308.23 deduction labeled "SCAN TRACK

PROMOTIONS."[1]  In addition to these types of weekly deductions, Defendants

_____

[1] For other Distributors, this is labeled "SCAN BASED PROMOTIONS."

subject Distributors to one-time deductions, such as, for example, a "Transfer Fee" equaling approximately 2% of the route sales price, a $500 "documentation fee" associated with the route purchase, and a charge of over $2,000 for the purchase of a mandatory "hand-held computer system."

24.     Defendants, upon information and belief, have never sought or obtained the Pennsylvania Department of Labor and Industry's approval for the above pay deductions or any other types of pay deductions.

25.     Defendants require Plaintiffs and other Distributors to assume many of Defendants' general business expenses.  For example, Defendants require Distributors to pay for gasoline and all vehicle lease, insurance, and maintenance expenses.

26.     Defendants do not provide workers' compensation and unemployment insurance to Plaintiffs and other Distributors.

27.     Plaintiffs and other Distributors work long hours.  For example, Pritchard typically works 50-60 hours per week; Legare works approximately 43-47 hours per week; and Austin typically works approximately 42-47 hours per week.

28.     Plaintiffs and other Distributors do not receive any extra overtime premium compensation for hours worked over 40 per week.

29.    In failing to pay the overtime premium to Plaintiffs and other

Distributors, Defendants acted willfully and with reckless disregard of clearly

applicable FLSA provisions

## CLASS/COLLECTIVE ALLEGATIONS

30.    Plaintiffs bring their FLSA and PWPCL claims on behalf of

themselves and all other all persons who, either individually or through

individually-owned corporate entities (e.g., individually-owned LLCs), have

performed food distribution work for Defendants within the past three years

pursuant to Distributor Agreements or similar contracts and have been assigned to

the Dupont (a.k.a. Pittston) or McAdoo (a.k.a. Hazleton) Depots.

31.    Plaintiffs bring their breach of contract claim on behalf of themselves

and all other all persons or corporate entities (e.g., individually-owned LLCs) who

have performed food distribution work for Defendants within the past six years

pursuant to Distributor Agreements or similar contracts and have been assigned to

the Dupont (a.k.a. Pittston) or McAdoo (a.k.a. Hazleton) Depots.

32.    Plaintiffs bring their unjust enrichment claim on behalf of themselves

and all other all persons or corporate entities (e.g., individually-owned LLCs) who

have performed food distribution work for Defendants within the past four years

pursuant to Distributor Agreements or similar contracts and have been assigned to the Dupont (a.k.a. Pittston) or McAdoo (a.k.a. Hazleton) Depots.

33.     Plaintiffs' FLSA claim should proceed as a collective action because Plaintiffs and other putative collective members, having worked pursuant to the common overtime pay policy described herein, are "similarly situated" as that term is defined in 29 U.S.C. § 216(b) and the associated decisional law.

34.     Class action treatment of Plaintiffs' state law claims is appropriate because, as alleged below, all of Federal Rule of Civil Procedure 23's class action requisites are satisfied.

35.     The class, upon information and belief, includes over 100 individuals, all of whom are readily ascertainable based on Defendants' payroll records and are so numerous that joinder of all class members is impracticable.

36.     Plaintiffs are class members, their claims are typical of the claims of other class members, and they have no interests that are antagonistic to or in conflict with the interests of other class members.

37.     Plaintiffs and their lawyers will fairly and adequately represent the class members and their interests.

38.     Questions of law and fact are common to all class members, because, *inter alia,* this action concerns Defendants' common business policies, as

10

described herein.  The legality of these practices will be determined through the application of generally applicable legal principles to common facts.

39.     Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact predominate over questions affecting only individual class members and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.

## COUNT I – FLSA

40.     All previous paragraphs are incorporated as though fully set forth herein.

41.     The FLSA requires that employees receive overtime premium compensation calculated at 150% of their regular pay rate for all hours worked over 40 per week.  <u>See</u> 29 U.S.C. § 207(a)(1).

42.     Defendants are employers required to comply with the FLSA's overtime pay mandate, and Plaintiffs and the collective members are employees entitled to the mandate's protections.

43.     Defendants violated the FLSA by failing to pay Plaintiffs and the collective members overtime premium compensation for hours worked over 40 per week.

44.    In violating the FLSA, Defendants acted willfully and with reckless disregard of clearly applicable FLSA provisions.

## COUNT II – PWPCL

45.    All previous paragraphs are incorporated as though fully set forth herein.

46.    The PWPCL prohibits pay deductions except for those explicitly permitted by law or regulation.  See 43 P.S. § 260.3; 34 Pa. Code § 9.1; see generally Ressler v. Jones Motor Co., Inc., 487 A.2d 424 (Pa. Super. 1985).

47.    Defendants are employers required to comply with the PWPCL, and Plaintiffs and other class members are employees entitled to the PWPCL's protections.

48.    The various deductions that Defendants made to the compensation of Plaintiffs and other class members, see ¶ 23 supra, are not permitted by the PWPCL and, therefore, violate the PWPCL.

## COUNT III – Breach of Contract

49.    All previous paragraphs are incorporated as though fully set forth herein.

50.    Plaintiffs and other class members entered into contracts with Defendants that require Defendants to use commercially reasonable efforts to, *inter*

*alia*, provide Distributors with adequate supplies of products, to pursue the development of new products, to preserve and develop the marketability of products, to assist with sales efforts, and to negotiate with Outlets regarding product price and selection.

51.     Moreover, these contracts (like all Pennsylvania contracts) impose on Defendants a duty of good faith and fair dealing in their performance and enforcement.

52.     Defendants have violated their contractual obligations (including the duty of good faith and fair dealing) by, *inter alia*, engaging in the business practices summarized in paragraph 22 supra.

53.     Defendants' contractual braches have caused Plaintiffs and other class members to suffer substantial monetary losses with respect to both diminished weekly earnings and deflated route valuations.

## COUNT IV – Unjust Enrichment

54.     All previous paragraphs are incorporated as though fully set forth herein.

55.     The Pennsylvania doctrine of unjust enrichment permits a plaintiff to recover from a defendant where (i) the plaintiff has conferred benefits on the defendant, (ii) such benefits have been appreciated by the defendant, and (iii) it

13

would be inequitable for the defendant to retain such benefits without payment of value.  Under such circumstances, the plaintiff must be compensated for the benefits unjustly received by the defendant.

56.     Under the unjust enrichment doctrine, Plaintiffs and all class members seek the recovery of monies retained by Defendants due to Defendants' extra-contractual business practice of requiring Distributors to incur the types of operating expenses ordinarily incurred by employers.  These operating expenses include, *inter alia*, gasoline expenses, vehicle lease payments, vehicle maintenance expenses, vehicle and liability insurance, worker's compensation insurance, and unemployment insurance.  Defendants' have avoided such expenses by misclassifying Plaintiffs and the class members as non-employee contractors even though Defendants both retain and exercise the right to control the most significant aspects of the Distributor position.  Under such circumstances, it is inequitable for Defendants to retain the benefits of the misclassification.

57.     Moreover, if the Court determines that any Plaintiff or group of class members is not in privity of contract with any Defendant or that the pay deductions associated with the PWPCL claim or the damages associated with the breach of contract claim are not governed by the contract, then such Plaintiff or group of class members will invoke the unjust enrichment doctrine to recover the value of

14

the pay deductions that are the subject of the PWPCL claim and/or the damages associated with the breach of contract claim.  Under the circumstances alleged herein, it would inequitable for Defendants to retain the benefits associated with such claims.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and other members of the class/collective, seek the following relief:

a.  the payment of all overtime wages;

b.  the reimbursement of all improper pay deductions, fees, charges, and other out-of-pocket expenditures;

c.  the value of Defendants' unpaid worker's compensation and unemployment insurance payments;

d.  monetary payments equaling the lost weekly earnings caused by Defendants' contractual breaches;

e.  monetary payments equaling the diminished route values caused by Defendants' contractual breaches;

f.  liquidated damages under the FLSA and PWPCL;

g.  prejudgment interest;

h.  all available declaratory or injunctive relief; and

i.   such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial.


Date:  June 20, 2017                                Respectfully,


_____
Peter Winebrake
R. Andrew Santillo
Mark J. Gottesfeld
Winebrake & Santillo, LLC
715 Twining Road, Suite 211
Dresher, PA 19025
(215) 884-2491

Barry H. Dyller, Esq.
Dyller Law Firm
Gettysburg House
88 North Franklin Street
Wilkes Barre, PA  18701
(570) 829-4860

*Plaintiffs' Counsel*

# Exhibit A

## BIMBO FOODS BAKERIES DISTRIBUTION, INC.
### DISTRIBUTION AGREEMENT

**THIS AGREEMENT** MADE EFFECTIVE _____ BY AND BETWEEN BIMBO FOODS BAKERIES DISTRIBUTION, INC., A BUSINESS CORPORATION WITH ITS PRINCIPAL OFFICE AT 255 BUSINESS CENTER DRIVE, HORSHAM, PA 19044 **(HEREIN REFERRED TO AS "BFBD")** AND _____ RESIDING AT _____

### W I T N E S S E T H :

WHEREAS, BFBD HAS HERETOFORE DEVELOPED AND OR ACQUIRED THE EXCLUSIVE DISTRIBUTION RIGHTS, TO DISTRIBUTE AND SELL VARIOUS FRESH BAKED PRODUCTS THROUGHOUT MUCH OF THE UNITED STATES; AND

WHEREAS, DISTRIBUTOR HAS THE ABILITY AND EXPERIENCE NECESSARY TO SELL AND DISTRIBUTE PRODUCTS SUCCESSFULLY WITHIN A SPECIFIC GEOGRAPHIC AREA; AND

WHEREAS, DISTRIBUTOR HAS PURCHASED FROM DISTRIBUTOR'S PRE-DECESSOR DISTRIBUTOR OR BFBD THE DISTRIBUTION RIGHTS IN THE SALES AREA HEREINAFTER DESCRIBED; AND

WHEREAS, THE PARTIES DESIRE TO ENTER INTO A WRITTEN AGREEMENT DESCRIBING AND SETTING FORTH THE TERMS AND CONDITIONS UNDER WHICH THEY WILL DO BUSINESS WITH EACH OTHER;

NOW THEREFORE, IN CONSIDERATION OF THE PREMISES, COVENANTS AND CONDITIONS SET FORTH HEREIN, AND FOR OTHER GOOD AND VALUABLE CONSIDERATION GIVEN AND RECEIVED, THE PARTIES MUTUALLY AGREE AS FOLLOWS:

### ARTICLE 1
### DEFINITIONS

§1.1   **SALES AREA**: SHALL MEAN THAT GEOGRAPHIC AREA WITHIN WHICH DISTRIBUTOR OWNS THE DISTRIBUTION RIGHTS, AS MORE SPECIFICALLY DESCRIBED IN SCHEDULE A ATTACHED HERETO AND MADE A PART HEREOF.

§1.2 **OUTLETS**: SHALL MEAN THOSE PURCHASERS OF PRODUCTS AS SPECIFICALLY DEFINED AND DESCRIBED IN SCHEDULE B ATTACHED HERETO AND MADE A PART HEREOF.

§1.3 **PRODUCTS**: SHALL MEAN ALL THOSE BAKERY PRODUCTS AS SPECIFICALLY DEFINED AND DESCRIBED IN SCHEDULE B ATTACHED HERETO AND MADE A PART HEREOF.

§1.4 **DISTRIBUTION RIGHTS**: SHALL MEAN THE SOLE RIGHT TO SELL AND DISTRIBUTE PRODUCTS TO OUTLETS IN THE SALES AREA, WHICH RIGHT HAS BEEN PURCHASED BY DISTRIBUTOR FROM BFBD OR FROM DISTRIBUTOR'S PREDECESSOR, AS EVIDENCED BY A BILL OF SALE EXECUTED HERETOFORE.

§1.5 **CHAIN**: SHALL MEAN A PERSON OR BUSINESS ENTITY THAT OPERATES MORE THAN ONE OUTLET AND MAKES DECISIONS REGARDING THE PURCHASE OF PRODUCTS FOR ITS OUTLETS AT A CENTRAL OFFICE.

§1.6 **FORCE MAJEURE**: SHALL MEAN AN ACT OF GOD, WAR, FIRE, EXPLOSION, RIOT, LOOTING, CIVIL COMMOTION, FAILURE OF MACHINERY OR PLANT, RESTRICTIONS BY A GOVERNMENT OR ANY COMPETENT AUTHORITY, STRIKES OR LOCK-OUTS AT EITHER PARTY'S PREMISES OR IN ANY RELATED TRADE OR BUSINESS OR ANY OTHER SIMILAR CIRCUMSTANCES OF WHATSOEVER KIND BEYOND THE CONTROL OF THE PARTY AFFECTED WHICH AFFECTS EITHER PARTY'S PERFORMANCE OF ITS OBLIGATIONS UNDER THIS AGREEMENT.

## ARTICLE 2
## RELATIONSHIP

§2.1 **EXTENT AND DURATION**: BFBD HEREBY RECOGNIZES DISTRIBUTOR'S OWNERSHIP OF THE DISTRIBUTION RIGHTS, WHICH OWNERSHIP WILL CONTINUE UNTIL THE DISTRIBUTION RIGHTS ARE SOLD OR TRANSFERRED AS PROVIDED HEREIN.

§2.2 **TERMINATION OF THIS AGREEMENT**: THE PARTIES AGREE THAT THE DISTRIBUTION RIGHTS CAN BE EXERCISED ONLY PURSUANT TO THE TERMS OF THIS AGREEMENT AND THAT ANY TERMINATION OF THIS AGREEMENT

REQUIRES DISTRIBUTOR OR BFBD, FOR THE ACCOUNT OF DISTRIBUTOR, TO SELL SUCH DISTRIBUTION RIGHTS AS PROVIDED HEREIN.

§2.3 **INDEPENDENT CONTRACTORS:** THE PARTIES INTEND TO CREATE AN INDEPENDENT CONTRACTOR RELATIONSHIP AND IT IS OF THE ESSENCE OF THIS AGREEMENT THAT DISTRIBUTOR BE AN INDEPENDENT CONTRACTOR FOR ALL PURPOSES AND DISTRIBUTOR SHALL ONLY IDENTIFY HIMSELF AS SUCH IN ALL THIRD PARTY DEALINGS.   ANY CONTRARY FINAL DE-TERMINATION BY ANY BOARD, TRIBUNAL OR COURT OF COMPETENT JURISDICTION SHALL REQUIRE THE AMENDMENT OF THIS AGREEMENT IN ANY WAY NECESSARY TO ESTABLISH AN INDEPENDENT CONTRACTOR RELATIONSHIP.   AS AN INDEPENDENT CONTRACTOR, DISTRIBUTOR HAS THE RIGHT TO OPERATE THE BUSINESS AS DISTRIBUTOR CHOOSES, AND SHALL BEAR ALL RISKS AND COSTS OF OPERATING SUCH BUSINESS. DISTRIBUTOR HAS NO AUTHORITY TO RETAIN ANY PERSON ON BEHALF OF BFBD.   IT IS EXPRESSLY UNDERSTOOD THAT DISTRIBUTOR HAS NO CLAIM, OR RIGHT UNDER ANY CIRCUMSTANCES, TO ANY BENEFITS OR OTHER COMPENSATION CURRENTLY PAID BY BFBD TO EMPLOYEES, OR HEREAFTER DECLARED BY BFBD FOR THE BENEFIT OF EMPLOYEES.   NO FIDUCIARY RELATIONSHIP EXISTS BETWEEN THE PARTIES.

§2.4 **NOTICE:** DISTRIBUTOR AGREES TO HAVE PAINTED IN A CONSPICUOUS MANNER ON ANY DELIVERY VEHICLE OWNED OR LEASED BY DISTRIBUTOR TO CARRY OUT THE TERMS HEREOF: "OWNED AND OPERATED BY _____, AN INDEPENDENT CONTRACTOR."

## ARTICLE 3
## SALE OF PRODUCTS

§3.1 **TITLE:** ALL PRODUCTS WILL BE SOLD TO DISTRIBUTOR ABSOLUTELY, AND TITLE TO AND RISK OF LOSS OF THE PRODUCTS SHALL PASS TO DISTRIBUTOR UPON DELIVERY OF THE PRODUCTS IN ACCORDANCE WITH §3.2 BELOW.

§3.2 **DELIVERY:** EXCEPT AS OTHERWISE PROVIDED HEREIN, BFBD AGREES TO SELL AND DELIVER TO DISTRIBUTOR OR TO ARRANGE FOR SUCH SALE AND DELIVERY BY AFFILIATES, AND DISTRIBUTOR AGREES TO BUY AND

ACCEPT, AT SUCH LOCATION AS BFBD MAY FROM TIME TO TIME REASONABLY DESIGNATE OR APPROVE, SUFFICIENT QUANTITIES OF THE PRODUCTS TO ADEQUATELY AND PROPERLY SUPPLY THE OUTLETS IN THE SALES AREA. BFBD AGREES TO USE COMMERCIALLY REASONABLE EFFORTS TO FILL DISTRIBUTOR'S ORDERS IN A REASONABLE AND TIMELY FASHION. IN CASE OF STRIKE, SHORTAGE OF MATERIALS, EQUIPMENT BREAKDOWN OR OTHER CAUSE, BFBD RESERVES THE RIGHT TO FILL ORDERS ON SUCH REASONABLE BASIS AS CIRCUMSTANCES THEN PERMIT. BFBD AND DISTRIBUTOR RECOGNIZE THAT CUTS AND PLUSES AND, ON RARE OCCASIONS, CANCELLATIONS OF DELIVERIES, IN WHOLE OR IN PART, ARE AN UNAVOIDABLE ASPECT OF FRESH BAKED GOODS PRODUCTION. IN THE EVENT OF SUCH PLUSES, DISTRIBUTOR AGREES TO USE DISTRIBUTOR'S REASONABLE EFFORTS TO EFFECT THE SALE OF THE ADDITIONAL PRODUCT. BFBD FURTHER AGREES TO ACCEPT AND GIVE FULL CREDIT FOR ANY DAMAGED OR OFF CODE PRODUCT WHICH IS NOT DAMAGED OR OFF CODE BY REASON OF DISTRIBUTOR'S NEGLIGENCE, AND WHICH HAS BEEN PROMPTLY RETURNED IN ACCORDANCE WITH BFBD'S THEN CURRENT STALE AND DAMAGE RETURN POLICY. BFBD RESERVES THE RIGHT TO MAKE REASONABLE AMENDMENTS TO SUCH STALE AND DAMAGE RETURN POLICY FROM TIME TO TIME.

§3.3 **TERMS:** PRODUCTS WILL BE SOLD TO DISTRIBUTOR ON TERMS AND PRICES ESTABLISHED BY BFBD FROM TIME TO TIME.

§3.4 **SETTLEMENT OF ACCOUNT:** ON OR BEFORE FRIDAY OF EACH WEEK, DISTRIBUTOR WILL REMIT TO BFBD OR ITS AFFILIATES THE PURCHASE PRICE OF ALL PRODUCTS DELIVERED TO DISTRIBUTOR DURING THE PRECEDING WEEK, LESS CREDIT FOR ANY OFF CODE OR DAMAGED PRODUCTS WHICH HAVE BEEN RETURNED IN ACCORDANCE WITH §3.2 ABOVE.

§3.5 **PURCHASE OF RECEIVABLES:** IN CASES WHERE THE DISTRIBUTOR SELLS AND DISTRIBUTES PRODUCTS TO CHAINS OR OUTLETS, WHICH HAVE BEEN APPROVED BY BFBD FOR CREDIT, BFBD OR ITS AFFILIATES SHALL, AT THE REQUEST AND FOR THE CONVENIENCE OF DISTRIBUTOR, PURCHASE

PROPERLY FILLED OUT AND EXECUTED CHARGE SLIPS AND/OR INVOICES FROM THE DISTRIBUTOR AT THEIR FACE VALUE, AND CREDIT DISTRIBUTOR'S ACCOUNT THEREFOR.  DISTRIBUTOR SHALL PROMPTLY REMIT ALL SUCH NECESSARY DOCUMENTATION TO BFBD AND SIGN SUCH ASSIGNMENTS AND AGREEMENTS AS MAY BE NECESSARY TO TRANSFER TO BFBD ALL RECEIVABLES AND ACCOUNTS.  IF A CHAIN ELECTS TO PAY FOR PURCHASES OF PRODUCT ON A SCAN, RATHER THAN DELIVERY BASIS, BFBD OR ITS AFFILIATES SHALL PURCHASE THE RECEIVABLE FROM DISTRIBUTOR AT THE FULL FACE VALUE OF THE SCAN REPORT.

§3.6   **PROMOTION PARTICIPATION PROGRAM**: IN CASES WHERE DISTRIBUTOR WISHES TO SELL PRODUCTS TO OUTLETS AT PRICES WHICH ARE LESS THAN THOSE REFLECTED ON BFBD'S THEN CURRENT SUGGESTED PRICE LIST, AND DISTRIBUTOR WISHES TO HAVE BFBD PARTICIPATE AND BFBD OR ITS AFFILIATES AGREE TO PARTICIPATE IN SUCH PROMOTION OR DISCOUNT PRICE, BFBD WILL CONTRIBUTE PURSUANT TO BFBD'S PROMOTION PARTICIPATION POLICY AS AMENDED FROM TIME TO TIME.

§3.7   **SECURITY INTEREST**: TO SECURE THE PAYMENT OF ANY INDEBTEDNESS OR LIABILITY OF DISTRIBUTOR TO BFBD OR ITS AFFILIATES NOW OR HEREAFTER ARISING PURSUANT TO THIS AGREEMENT OR OTHERWISE, DISTRIBUTOR HEREBY GRANTS AND CONVEYS TO BFBD A CONTINUING AND GENERAL SECURITY INTEREST IN THE DISTRIBUTION RIGHTS, ALL OTHER ASSETS USED IN CONNECTION WITH THE  OPERATION OF THE DISTRIBUTION RIGHTS, ALL RIGHTS HEREUNDER AND ALL PRODUCTS AND RECEIVABLES OF THE DISTRIBUTOR, AND GRANTS TO BFBD THE RIGHTS OF A SECURED PARTY.  DISTRIBUTOR AGREES TO EXECUTE THE BFBD SECURITY AGREEMENT AND FINANCING STATEMENT(S) TO EVIDENCE SUCH SECURITY INTEREST.  ANY DEFAULT UNDER THE BFBD SECURITY AGREEMENT BY DISTRIBUTOR SHALL BE A DEFAULT UNDER THIS AGREEMENT.

§3.8   **DEFAULT**: NOTHING HEREIN SHALL BE DEEMED TO REQUIRE BFBD TO FILL AN ORDER OF DISTRIBUTOR DURING ANY TIME WHEN DISTRIBUTOR IS IN

DEFAULT OF ANY PAYMENT OR OTHER OBLIGATION TO BFBD OR ITS AFFILIATES.

### ARTICLE 4
### DISTRIBUTOR'S OBLIGATIONS

§4.1   **RESULTS:**   IN ORDER TO MAXIMIZE ITS PURCHASES FROM BFBD, DISTRIBUTOR AGREES TO DEVELOP AND MAXIMIZE SALES OF PRODUCTS TO OUTLETS WITHIN THE SALES AREA BY MAINTAINING AN ADEQUATE AND FRESH SUPPLY OF PRODUCTS IN ALL OUTLETS; ROTATING PRODUCTS TO PROMOTE THEIR SALE BEFORE THEY BECOME STALE OR OFF CODE; PROMPTLY REMOVING ALL STALE OR OFF CODE PRODUCTS; COOPERATING WITH BFBD OR ITS AFFILIATES IN ITS MARKETING PROGRAMS, MAINTAINING A COMPUTER ASSISTED RECORD-KEEPING SYSTEM COMPATIBLE WITH THE SYSTEM MAINTAINED BY BFBD NOW OR IN THE FUTURE; AND PROVIDING SERVICE ON A BASIS CONSISTENT WITH GOOD INDUSTRY PRACTICE TO ALL OUTLETS REQUESTING SERVICE IN THE SALES AREA. DISTRIBUTOR IS NOT REQUIRED TO SERVICE ANY OUTLET THAT HAS PROVEN CONSISTENTLY TO BE UNPROFITABLE, PROVIDED THAT WHERE A CHAIN REQUIRES THAT SUCH AN OUTLET BE SERVED AS A CONDITION FOR SERVING ITS OTHER OUTLETS, THE PROFITABILITY OF ANY OUTLET WHICH IS PART OF THAT CHAIN SHALL BE JUDGED ON THE BASIS OF THE PROFITABILITY OF THE CHAIN AS A WHOLE. NOTHING HEREIN SHALL BE DEEMED TO PROHIBIT DISTRIBUTOR'S RIGHT TO CARRY AND DISTRIBUTE MERCHANDISE FOR OTHER COMPANIES OR OTHERWISE ENGAGE IN ANY OTHER BUSINESS ACTIVITY UNLESS AND EXCEPT TO THE EXTENT THAT SUCH OTHER MERCHANDISE IS COMPETITIVE WITH OR COULD CONTAMINATE THE PRODUCTS OR SUCH OTHER BUSINESS ACTIVITY IS INCONSISTENT OR INTERFERES WITH THE OBLIGATIONS OF THE DISTRIBUTOR HEREUNDER.

§4.2   **COMPLIANCE:**   DISTRIBUTOR SHALL OPERATE THE BUSINESS IN COMPLIANCE WITH ALL FEDERAL, STATE AND LOCAL LAWS, RULES AND REGULATIONS.

§4.3   **PERSONAL SERVICES NOT REQUIRED**: NOTHING HEREIN SHALL BE DEEMED TO CONTEMPLATE OR REQUIRE THAT DISTRIBUTOR PERFORM ANY OF THE SERVICES CALLED FOR BY THIS AGREEMENT PERSONALLY, AND DISTRIBUTOR SHALL BE FREE TO ENGAGE SUCH PERSONS AS DISTRIBUTOR DEEMS APPROPRIATE TO ASSIST IN DISCHARGING DISTRIBUTOR'S RESPONSIBILITIES HEREUNDER. DISTRIBUTOR SHALL HAVE THE EXCLUSIVE RIGHT TO SELECT, FIX THE COMPENSATION OF, DISCHARGE AND OTHERWISE TO MANAGE, SUPERVISE AND CONTROL ALL PERSONS ENGAGED BY DISTRIBUTOR AND SHALL, WITH RESPECT TO ALL SUCH PERSONS, PERFORM ALL OBLIGATIONS AND DISCHARGE ALL LIABILITIES IMPOSED UPON DISTRIBUTOR UNDER ALL GOVERNMENT LAWS, RULES OR REGULATIONS ("LAWS"), WHETHER SUCH LAWS RELATE TO LABOR, EMPLOYMENT STANDARDS, WORKER'S COMPENSATION, UNEMPLOYMENT INSURANCE, PAY EQUITY OR ANY OTHER GOVERNMENTAL REQUIREMENT; FILE ALL REQUIRED TAX INFORMATION, REPORTS AND PAY AND/OR WITHHOLD ALL APPLICABLE PAYROLL-RELATED TAXES WITH RESPECT TO ANY EMPLOYEES OF DISTRIBUTOR. DISTRIBUTOR IN ALL EVENTS SHALL BE AND REMAIN RESPONSIBLE FOR INSURING THAT ALL PERSONS ENGAGED BY DISTRIBUTOR COMPLY FULLY WITH ALL THE TERMS AND CONDITIONS OF THIS AGREEMENT. ANY BREACH OF THIS AGREEMENT BY ANY PERSON ENGAGED BY DISTRIBUTOR SHALL BE DEEMED TO BE A BREACH BY DISTRIBUTOR.

§4.4   **NON-COMPLIANCE**: FAILURE TO CARRY OUT THE TERMS, CONDITIONS AND OBLIGATIONS LISTED IN THIS ARTICLE OR ELSEWHERE IN THIS AGREEMENT SHALL BE CONSIDERED A BREACH OF THIS AGREEMENT AND SHALL ENTITLE BFBD TO TERMINATE THIS AGREEMENT AS MORE SPECIFICALLY SET FORTH IN ARTICLE 8 HEREOF, EXCEPT THAT DISTRIBUTOR SHALL NOT BE RESPONSIBLE FOR FAILURES CAUSED BY FORCE MAJEURE, PROVIDED HOWEVER, THAT AN EVENT OF FORCE MAJEURE SHALL NOT EXCUSE DISTRIBUTOR FROM ANY OBLIGATIONS TO PAY FOR PRODUCTS PURSUANT TO ARTICLE 3.

## ARTICLE 5
## BFBD' OBLIGATIONS

§5.1   **DELIVERY AND COOPERATION**: BFBD SHALL USE COMMERCIALLY REASONABLE EFFORTS TO DELIVER TO DISTRIBUTOR SUFFICIENT QUANTITIES OF THE PRODUCTS TO SUPPLY OUTLETS REQUESTING SERVICE IN THE SALES AREA, TO ASSIST IN THE DEVELOPMENT OF NEW OUTLETS, TO PURSUE THE DEVELOPMENT OF NEW PRODUCTS, TO PRESERVE AND DEVELOP THE QUALITY AND MARKETABILITY OF THE PRODUCTS AND TO ASSIST AND COOPERATE WITH DISTRIBUTOR'S SALES EFFORTS, EXCEPT THAT BFBD SHALL NOT BE RESPONSIBLE FOR FAILURES CAUSED BY FORCE MAJEURE.

§5.2   **SALES TO CHAINS**: IN ORDER TO ENABLE DISTRIBUTOR TO PURSUE BUSINESS OPPORTUNITIES WITH CHAINS, WHICH MAY REQUIRE STANDARD TERMS FOR ALL DISTRIBUTORS, DISTRIBUTOR HEREBY DESIGNATES BFBD AND ITS AFFILIATES AND BFBD HEREBY AGREES TO ACT, AS DISTRIBUTOR'S AGENT. BFBD SHALL USE COMMERCIALLY REASONABLE EFFORTS TO OBTAIN FROM CHAINS AUTHORIZATION TO SELL PRODUCTS IN THE CHAINS AND INFORMATION REGARDING THE PRICES AND TERMS AT WHICH THE CHAINS WOULD BE WILLING TO PURCHASE PRODUCTS FOR THEIR OUTLETS, AND BFBD WILL COMMUNICATE THE INFORMATION CONCERNING SUCH AUTHORIZATIONS, PRICES AND TERMS TO DISTRIBUTOR. THIS APPOINTMENT OF BFBD AND ITS AFFILIATES AS DISTRIBUTOR'S AGENT SHALL NOT PREVENT DISTRIBUTOR FROM HAVING THE RIGHT TO NEGOTIATE PRICES AND TERMS DIRECTLY WITH A CHAIN AND SELLING PRODUCTS TO THE CHAIN AT WHATEVER PRICES AND TERMS DISTRIBUTOR CAN NEGOTIATE. IN ADDITION, DISTRIBUTOR SHALL HAVE THE OPTION TO REVOKE THE DESIGNATION OF BFBD AS DISTRIBUTOR'S AGENT AT ANY TIME ON THIRTY (30) DAYS NOTICE. NOTHING HEREIN SHALL REQUIRE BFBD TO PAY SLOTTING ALLOWANCES OR OTHER SIMILAR FEES OR CHARGES IMPOSED BY THE CHAINS.

## ARTICLE 6
## TRANSFER OF RIGHTS

§6.1 **CONDITIONS OF ASSIGNABILITY:** THE DISTRIBUTION RIGHTS ARE OWNED BY THE DISTRIBUTOR AND MAY BE SOLD OR OTHERWISE TRANSFERRED IN WHOLE OR IN PART BY DISTRIBUTOR, OR IN THE EVENT OF DISTRIBUTOR'S DEATH, BY A LEGAL REPRESENTATIVE OF DISTRIBUTOR'S ESTATE, PROVIDED THAT ANY SUCH SALE OR TRANSFER SHALL BE SUBJECT TO: (A) THE PRIOR WRITTEN APPROVAL OF BFBD, WHICH APPROVAL WILL NOT BE UNREASONABLY WITHHELD; AND (B) A RIGHT OF FIRST REFUSAL ON THE PART OF BFBD AT THE SAME TERMS AND CONDITIONS OFFERED TO DISTRIBUTOR OR DISTRIBUTOR'S ESTATE (THE "OFFER") BY A BONA FIDE PURCHASER OR TRANSFEREE (THE "OFFEROR"). THE RIGHT OF APPROVAL AND RIGHT OF REFUSAL REFERRED TO HEREIN SHALL EXPIRE UNLESS DISTRIBUTOR IS NOTIFIED BY BFBD THAT IT DOES NOT APPROVE THE SALE OR TRANSFER OR THAT IT WISHES TO EXERCISE ITS RIGHT OF FIRST REFUSAL BY NOTICE GIVEN WITHIN TEN (10) DAYS AFTER THE LAST TO OCCUR OF THE FOLLOWING:

(I) RECEIPT BY BFBD OF WRITTEN NOTICE OF INTENT TO SELL OR TRANSFER TO A NAMED OFFEROR ON TERMS AND CONDITIONS FULLY SET FORTH IN SUCH NOTICE, AND

(II) RECEIPT BY BFBD OF THE OFFEROR'S CURRENT FINANCIAL STATEMENTS AND SUCH ADDITIONAL INFORMATION CONCERNING THE OFFEROR'S FINANCIAL CONDITION, CREDIT, DRIVING RECORDS, AND OTHER MATTERS REASONABLY APPROPRIATE TO BFBD IN ITS DETERMINATION. IF THE CONTEMPLATED SALE OR TRANSFER IS NOT A BONA FIDE TRANSFER FOR VALUE, THE PRICE TO BE PAID BY BFBD SHALL BE THE MARKET VALUE OF THE DISTRIBUTION RIGHTS AT THE TIME OF RECEIPT OF SUCH NOTICE OF INTENT.

IF BFBD RIGHT OF APPROVAL AND RIGHT OF FIRST REFUSAL EXPIRE AS PROVIDED ABOVE, DISTRIBUTOR MAY CONSUMMATE THE TRANSFER TO THE OFFEROR ON THE TERMS OF THE OFFER; PROVIDED (I) SUCH ACTION OR INACTION WILL NOT ELIMINATE OR IN ANY WAY AFFECT BFBD RIGHT

OF APPROVAL OR ITS RIGHT OF FIRST REFUSAL ON FUTURE TRANSFERS OF THE DISTRIBUTION RIGHTS; AND (II) IF NO TRANSFER TO THE OFFEROR IS CONSUMMATED ON THE TERMS OF THE OFFER WITHIN 90 DAYS AFTER THE EXPIRATION OF BFBD RIGHT OF APPROVAL OR RIGHT OF FIRST REFUSAL, ALL OF THE PROVISIONS OF THIS SECTION 6.1 SHALL REAPPLY.

§6.2   **DEATH:** IN THE EVENT OF THE DEATH OF DISTRIBUTOR, BFBD MAY REQUIRE THE DISTRIBUTOR'S ESTATE TO SELL THE DISTRIBUTION RIGHTS. IF THE ESTATE DOES NOT SELL SUCH DISTRIBUTION RIGHTS WITHIN A PERIOD OF NINETY (90) DAYS FROM THE DATE ON WHICH BFBD REQUIRES IT TO DO SO, BFBD SHALL HAVE THE RIGHT TO SELL THE SAME, AS THE ESTATE'S AGENT, TO A QUALIFIED PURCHASER.

§6.3   **PROCEEDS:** ANY SALE SHALL BE FOR THE ACCOUNT OF DISTRIBUTOR OR DISTRIBUTOR'S ESTATE, AND THE PROCEEDS OF THE SALE, AFTER DEDUCTING THEREFROM ANY MONIES OWED BY DISTRIBUTOR TO BFBD, ALL REASONABLE COSTS AND EXPENSES IN CONNECTION WITH THE SALE (INCLUDING WITHOUT LIMITATION THE COST OF REMOVING ANY OFF CODE OR DAMAGED PRODUCTS IN DISTRIBUTOR'S SALES AREA) AND THE SATISFACTION OF ANY OUTSTANDING DEBTS, LIENS, SECURITY INTERESTS, LEGAL FEES AND SIMILAR EXPENSES, SHALL BE TURNED OVER TO DISTRIBUTOR OR DISTRIBUTOR'S ESTATE.

§6.4   **TRANSFER DOCUMENTS:** IN THE EVENT OF A SALE OR TRANSFER BY OR FOR THE ACCOUNT OF DISTRIBUTOR OR DISTRIBUTOR'S ESTATE AS DESCRIBED IN THIS ARTICLE 6, THE DISTRIBUTOR OR THE ESTATE SHALL EXECUTE AN APPROPRIATE BILL OF SALE TO THE PURCHASER, AND A GENERAL RELEASE TERMINATING, CANCELING AND SURRENDERING DISTRIBUTOR'S RIGHTS UNDER THIS AGREEMENT AND RELEASING ANY AND ALL CLAIMS AGAINST BFBD AND ITS AFFILIATES AND ITS OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, SUCCESSORS AND ASSIGNS ARISING UNDER OR OUT OF THIS AGREEMENT, AND BFBD AGREES TO ENTER INTO A NEW DISTRIBUTION AGREEMENT WITH THE PURCHASER IN THE FORM OF AGREEMENT THEN BEING USED BY BFBD.

**ARTICLE 7**

## SERVICE FAILURES AND CHANGES

§7.1   **PARTIAL ABANDONMENT:** IF DISTRIBUTOR FAILS TO SERVICE ANY OUTLET IN THE SALES AREA AND SUCH FAILURE IS NOT REMEDIED WITHIN THREE (3) DAYS AFTER RECEIPT OF WRITTEN NOTICE THEREOF, THEN, IN ADDITION TO ANY OTHER LAWFUL RIGHTS AND REMEDIES BFBD MAY HAVE, BFBD MAY DEEM SUCH OUTLET ABANDONED AND MAY MAKE OTHER ARRANGEMENTS FOR THE SERVICE THEREOF. DISTRIBUTOR SHALL NOT BE ENTITLED TO ANY PROCEEDS DERIVED FROM SUCH SERVICE OR PROCEEDS IN CONNECTION WITH THE SALE OF DISTRIBUTION RIGHTS TO SUCH OUTLET

§7.2   **CHANGE IN DELIVERY METHOD:** IN THE EVENT ANY OUTLET MAKES AN INDEPENDENT DETERMINATION TO ACCEPT DELIVERY OF THE PRODUCTS BY ANY METHOD OTHER THAN STORE DOOR DELIVERY, AND SO INFORMS BFBD OR DISTRIBUTOR, THE INFORMED PARTY SHALL   PROMPTLY COMMUNICATE TO THE OTHER THE SERVICE REQUIREMENTS AND TERMS UNDER WHICH THE OUTLET NOW DESIRES SERVICE, AND PROVIDED THOSE NEW SERVICE REQUIREMENTS CONTINUE TO CALL FOR DELIVERY IN THE SALES AREA, DISTRIBUTOR SHALL HAVE THE FIRST RIGHT TO EFFECT SUCH ALTERNATIVE SERVICE.  DISTRIBUTOR SHALL ELECT TO PROVIDE SUCH ALTERNATIVE SERVICES BY (I) PROVIDING WRITTEN NOTICE THEREOF TO BFBD WITHIN FIVE (5) DAYS AFTER RECEIVING NOTICE OF THE ALTERNATIVE SERVICE REQUIREMENTS, AND (II) COMMENCING SUCH ALTERNATIVE SERVICE PROMPTLY THEREAFTER (OR ON SUCH SCHEDULE AS MAY BE ACCEPTABLE TO THE OUTLET). IF DISTRIBUTOR ELECTS NOT TO EFFECT SUCH ALTERNATE SERVICE OR IF THE OUTLET'S NEW REQUIREMENTS INCLUDE DELIVERY OUTSIDE THE SALES AREA, BFBD SHALL THEREAFTER BE PERMITTED TO MAKE OTHER ARRANGEMENTS TO SERVE SUCH OUTLET, WHICH SERVICE SHALL NOT BE DEEMED TO VIOLATE DISTRIBUTOR'S RIGHTS HEREUNDER AND DISTRIBUTOR SHALL NOT BE ENTITLED TO ANY PROCEEDS DERIVED FROM SUCH SERVICE. HOWEVER, DISTRIBUTOR SHALL CONTINUE TO OWN THOSE DISTRIBUTION RIGHTS DEFINED HEREIN TO THE OUTLET WITHIN THE SALES AREA.

§7.3   **TEMPORARY SERVICE BY BFBD:**   IF DISTRIBUTOR OR DISTRIBUTOR'S ESTATE, AS THE CASE MAY BE, IS NOT ABLE TO OR DOES NOT PERFORM THE OBLIGATIONS UNDER THIS AGREEMENT, DISTRIBUTOR OR DISTRIBUTOR'S ESTATE SHALL MAKE OTHER ADEQUATE PROVISION FOR SUCH PERFORMANCE AT THE EXPENSE OF DISTRIBUTOR OR DISTRIBUTOR'S ESTATE. IF NO SUCH PROVISION IS MADE, BFBD, WITHIN THE LIMITS OF ITS ABILITY TO DO SO, MAY MAKE ARRANGEMENTS TO HAVE THESE OBLIGATIONS PERFORMED FOR THE ACCOUNT OF DISTRIBUTOR, DEDUCTING FROM THE REVENUES GENERATED THE REASONABLE EXPENSES OF SUCH PERFORMANCE AND DELIVERING THE BALANCE, IF ANY, TO DISTRIBUTOR. SUCH TEMPORARY PERFORMANCE SHALL NOT RELIEVE DISTRIBUTOR OF ANY OF THE OBLIGATIONS IMPOSED BY THIS AGREEMENT, CONSTITUTE AN ASSUMPTION BY BFBD OF ANY OBLIGATIONS OF DISTRIBUTOR, NOR ACT TO CURE ANY DEFAULT WHICH MAY EXIST ON THE PART OF DISTRIBUTOR.

## ARTICLE 8
## TERMINATION

§8.1   **BREACH:** EXCEPT AS SET FORTH IN THIS ARTICLE OR UPON THE SALE OR TRANSFER OF ALL OF THE DISTRIBUTOR'S DISTRIBUTION RIGHTS, THIS AGREEMENT SHALL NOT BE TERMINATED OR CANCELED PROVIDED DISTRIBUTOR CARRIES OUT THE TERMS HEREOF. IN THE EVENT OF DISTRIBUTOR'S BREACH OF ANY OBLIGATIONS OR COVENANTS UNDER THIS OR ANY OTHER AGREEMENT WITH BFBD, BFBD MAY TERMINATE THE AGREEMENT AS SET FORTH BELOW.

§8.2   **NON-CURABLE BREACH:** IF THE BREACH BY DISTRIBUTOR INVOLVES CRIMINAL ACTIVITY OR FRAUD, THREATENS PUBLIC HEALTH OR SAFETY, OR THREATENS TO DO SIGNIFICANT HARM TO BFBD, ITS AFFILIATES, IT OPERATIONS, ITS TRADEMARKS OR COMMERCIAL REPUTATION, BFBD MAY TERMINATE THIS AGREEMENT IMMEDIATELY UPON WRITTEN NOTICE AND DISTRIBUTOR SHALL HAVE NO RIGHT TO CURE.

§8.3   **CURABLE BREACH**:  IN THE EVENT OF BREACH BY DISTRIBUTOR OTHER THAN UNDER §8.2, BFBD SHALL GIVE DISTRIBUTOR THREE (3) BUSINESS DAYS WRITTEN NOTICE WITHIN WHICH DISTRIBUTOR MAY CURE THE BREACH.  IF DISTRIBUTOR FAILS TO CURE SUCH BREACH WITHIN SAID THREE (3) DAY PERIOD, BFBD MAY THEREAFTER TERMINATE THIS AGREEMENT AND DISTRIBUTOR SHALL HAVE NO FURTHER RIGHT TO CURE; PROVIDED, FURTHER, THAT THE PARTIES AGREE THAT REPEATED VIOLATIONS CONSTITUTE A CHRONIC BREACH AND THREATEN SIGNIFICANT HARM TO BFBD, ITS OPERATIONS, ITS TRADEMARKS OR COMMERCIAL REPUTATION, AND IN SUCH EVENT BFBD SHALL BE ENTITLED TO TERMINATE THIS AGREEMENT PURSUANT TO §8.2 AND DISTRIBUTOR SHALL HAVE NO FURTHER RIGHT TO CURE.

§8.4   **ACTIONS FOLLOWING TERMINATION**: TERMINATION UNDER §8.2 OR §8.3 ABOVE SHALL ENTITLE BFBD TO OPERATE THE BUSINESS FOR THE ACCOUNT OF THE DISTRIBUTOR, DEDUCTING FROM THE REVENUES GENERATED THE REASONABLE EXPENSES OF SUCH PERFORMANCE AND DELIVERING THE BALANCE, IF ANY, TO DISTRIBUTOR.  TERMINATION SHALL REQUIRE DISTRIBUTOR TO SELL THE DISTRIBUTION RIGHTS, AND IN THE EVENT THAT DISTRIBUTOR HAS NOT CONSUMMATED A SALE TO A QUALIFIED PURCHASER WITHIN 90 DAYS OF THE DATE OF TERMINATION, BFBD SHALL BE AUTHORIZED TO SELL DISTRIBUTOR'S DISTRIBUTION RIGHTS TO A PURCHASER AT THE BEST PRICE WHICH CAN BE OBTAINED AFTER PROPER NOTICE AND ADVERTISEMENT.  SAID SALE SHALL BE FOR THE ACCOUNT OF THE DISTRIBUTOR, AND THE PROVISIONS OF §6.3 AND §6.4 HEREOF SHALL APPLY.

**ARTICLE 9**
**TRANSFER FEE**

§9.1   **PAYMENT OF FEE**: IN THE EVENT OF A SALE OR TRANSFER BY DISTRIBUTOR OR BY BFBD FOR THE ACCOUNT OF DISTRIBUTOR OF ALL OR ANY PORTION OF DISTRIBUTOR'S DISTRIBUTION RIGHTS, INCLUDING A SALE TO BFBD, DISTRIBUTOR SHALL PAY A TRANSFER FEE TO BFBD IN AN

AMOUNT EQUAL TO TWO PER CENT (2%) OF THE SALES PRICE, IN FULL
CONSIDERATION FOR THE ADMINISTRATIVE ACTIVITIES UNDERTAKEN BY
BFBD IN CONNECTION THEREWITH.

**ARTICLE 10**
**TRADEMARKS, TRADE NAMES**
**AND COMPUTER SOFTWARE USAGE**

§10.1  <u>PERMISSION FOR USE</u>:   BFBD HEREBY GRANTS TO DISTRIBUTOR A
LIMITED, NON-EXCLUSIVE RIGHT IN THE SALES AREA ONLY TO USE THE
TRADEMARKS SET FORTH ON SCHEDULE B AND ANY OTHER TRADEMARKS,
TRADE NAMES OR GRAPHICAL DESIGNATIONS ON THE PACKAGING OF THE
PRODUCTS SUPPLIED BY BFBD TO DISTRIBUTOR HEREUNDER (THE
"MARKS"), SOLELY TO IDENTIFY SAID PRODUCTS AND TO IDENTIFY
DISTRIBUTOR AS A DISTRIBUTOR OF SAID PRODUCTS.   DISTRIBUTOR
ACKNOWLEDGES THAT THE MARKS ARE THE EXCLUSIVE PROPERTY OF
BFBD OR ITS AFFILIATES, OR IF APPLICABLE, THE LICENSOR THEREOF, AS
THE CASE MAY BE (THE "OWNERS"), AND DISTRIBUTOR AGREES THAT IT
WILL NOT DISPUTE OR CONTEST THE EXCLUSIVE RIGHT, TITLE AND
INTEREST OF THE OWNERS IN, OR THE VALIDITY OF, ANY OF THE MARKS.
DISTRIBUTOR ACKNOWLEDGES THAT IT DOES NOT HAVE, AND WILL NOT
ACQUIRE, ANY RIGHT, TITLE OR INTEREST IN ANY OF THE MARKS OR IN
THE GOOD WILL NOW OR HEREAFTER ATTACHING THERETO, AND THAT
ALL SUCH GOODWILL SHALL INURE SOLELY TO THE BENEFIT OF THE
OWNER OF EACH MARK.   DISTRIBUTOR AGREES THAT IT SHALL NOT USE
ANY OF THE MARKS IN ANY CORPORATE TITLE OR TRADING NAME OF ANY
CORPORATION, COMPANY, PARTNERSHIP, ASSOCIATION, BUSINESS OR
SOLE PROPRIETORSHIP OF THE DISTRIBUTOR, OR WITH WHICH THE
DISTRIBUTOR MAY BECOME AFFILIATED OR RELATED THROUGH
OWNERSHIP OR OTHERWISE.   DISTRIBUTOR AGREES THAT IT SHALL NOT
TAMPER WITH ANY OF THE MARKS OR OTHER WRITTEN MATTER OR
GRAPHICAL DESIGNATIONS ON THE PACKAGING OF THE PRODUCTS
SUPPLIED BY BFBD TO DISTRIBUTOR HEREUNDER AND SHALL NOT

OTHERWISE MODIFY OR CHANGE THE PACKAGING THEREOF IN ANY WAY. ANY MARKETING OR PROMOTIONAL MATERIAL PROPOSED TO BE USED BY DISTRIBUTOR WHICH REFERENCES THE MARKS (OTHER THAN MARKETING OR PROMOTIONAL MATERIAL SUPPLIED BY BFBD OR ANY OF THE OWNERS) SHALL BE SUBMITTED TO BFBD FOR APPROVAL, AND SAID MATERIAL SHALL NOT BE USED WITHOUT THE PRIOR WRITTEN CONSENT OF BFBD.

§10.2 **SOFTWARE ACCOUNTING SYSTEM:** DISTRIBUTOR IS HEREBY AUTHORIZED TO USE ANY PROPRIETARY SOFTWARE SYSTEM AND PROGRAM DEVELOPED BY BFBD OR ITS AFFILIATES FOR ROUTE SALES ACCOUNTING AS THE SAME MAY BE AMENDED FROM TIME TO TIME, BUT SHALL ACQUIRE NO OTHER INTEREST OR RIGHT IN THE SOFTWARE AND SHALL NOT ATTEMPT TO MODIFY, DECOMPILE, DISASSEMBLE OR OTHERWISE REVERSE ENGINEER THE SOFTWARE.

§10.3 **RETURN UPON TERMINATION:** UPON THE TERMINATION OF THIS AGREEMENT OR OF DISTRIBUTOR'S RIGHT TO USE ANY OF THE MARKS, DISTRIBUTOR SHALL IMMEDIATELY CEASE ITS USE OF THE MARKS (OR THE TERMINATED MARKS, AS THE CASE MAY BE), AND SHALL NOT THEREAFTER USE ANY TRADEMARKS, TRADE NAMES OR OTHER DESIGNATIONS ASSOCIATED WITH OR CONFUSINGLY SIMILAR TO SAID MARKS, OR MAKE ANY REPRESENTATIONS, DIRECTLY OR INDIRECTLY, THAT IT CONTINUES TO DISTRIBUTE PRODUCTS BEARING SAID MARKS.

## ARTICLE 11
### MISCELLANEOUS

§11.1 **NOTICES:** ANY NOTICE REQUIRED OR PERMITTED UNDER THIS AGREEMENT SHALL BE DEEMED PROPERLY GIVEN WHEN PERSONALLY RECEIVED OR ONE (1) DAY AFTER DELIVERY TO AN OVERNIGHT COURIER SERVICE FOR FIRST DAY DELIVERY, OR FIVE (5) DAYS AFTER DEPOSIT IN THE MAILS, RETURN RECEIPT REQUESTED, FIRST CLASS POSTAGE PRE-PAID. ALL NOTICES SHALL BE ADDRESSED TO DISTRIBUTOR AT THE ADDRESS STATED ABOVE AND TO BFBD, AT THE ADDRESS INDICATED IN SCHEDULE B ATTACHED HERETO. EITHER PARTY MAY DESIGNATE ANOTHER ADDRESS FOR RECEIPT OF NOTICES BY WRITTEN NOTICE DULY GIVEN IN

ACCORDANCE WITH THIS §11.1.

§11.2   **SURVIVAL: BFBD AFFILIATES:** THIS AGREEMENT SHALL BE BINDING UPON HEIRS, PERSONAL REPRESENTATIVES, SUCCESSORS OR ASSIGNS OF THE PARTIES HERETO.   THE PARTIES RECOGNIZE AND AGREE THAT ANY OBLIGATIONS OF BFBD HEREUNDER MAY FROM TIME TO TIME BE UNDERTAKEN BY AFFILIATES OF BFBD BUT BFBD SHALL REMAIN RESPONSIBLE THEREFOR.

§11.3   **INCORPORATION BY REFERENCE:** THIS AGREEMENT IS SUBJECT TO AND AFFECTED BY THE TERMS AND CONDITIONS OF A CERTAIN BILL OF SALE EXECUTED BY THE PARTIES IMMEDIATELY PRIOR HERETO AND SAID BILL OF SALE AND THE SCHEDULES HERETO, ARE INCORPORATED HEREIN BY REFERENCE AS THOUGH FULLY SET FORTH IN THIS AGREEMENT.

§11.4   **ENTIRE AGREEMENT:** THIS AGREEMENT, TOGETHER WITH THE BILL OF SALE REFERRED TO IN §11.3 ABOVE AND ANY OTHER AGREEMENTS EXECUTED BETWEEN THE PARTIES ON EVEN DATE HEREWITH, SETS FORTH THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND SUPERSEDES ALL PRIOR AGREEMENTS, DISCUSSIONS, NEGOTIATIONS, UNDERSTANDINGS, REPRESENTATIONS, CONDITIONS, WARRANTIES AND COVENANTS BETWEEN THEM WITH RESPECT TO THIS SUBJECT MATTER. UNLESS SET FORTH HEREIN, NEITHER PARTY SHALL BE LIABLE FOR ANY REPRESENTATION MADE TO THE OTHER.   THIS AGREEMENT MAY BE AMENDED OR MODIFIED ONLY BY A WRITING SIGNED BY BOTH PARTIES.

§11.5   **INDEMNIFICATION:** EACH PARTY HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD THE OTHER HARMLESS AGAINST A THIRD PARTY AS TO ANY COSTS, CHARGES OR CLAIMS INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND COSTS OF SETTLEMENT WHICH MAY ARISE OUT OF SUCH PARTY OR ITS EMPLOYEES' OR INDEPENDENT CONTRACTORS' DIRECT OR INDIRECT FAILURE TO PERFORM ANY OBLIGATION AND/OR DISCHARGE ANY LIABILITY ARISING HEREUNDER.

§11.6   **DESIGNATION AS AGENT:** DISTRIBUTOR HEREBY IRREVOCABLY GRANTS BFBD A LIMITED POWER OF ATTORNEY WITH FULL AND COMPLETE AUTHORITY TO TRANSFER DISTRIBUTOR'S DISTRIBUTION RIGHTS, OR

PERFORM ANY OF DISTRIBUTOR'S OBLIGATIONS HEREUNDER FOR DISTRIBUTOR'S ACCOUNT IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT.    THIS APPOINTMENT SHALL SURVIVE THE DEATH OR DISABILITY OF DISTRIBUTOR OR THE TERMINATION OF THIS AGREEMENT.

§11.7 <u>ACQUISITIONS</u>: NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THIS AGREEMENT SHALL NOT APPLY TO ANY PRODUCTS OR PRODUCT LINES OBTAINED BY BFBD, OR ANY CORPORATION RELATED THERETO, THROUGH ACQUISITION AFTER THE DATE HEREOF.

§11.8 <u>CONTROLLING LAW</u>: THE VALIDITY, INTERPRETATION AND PERFORMANCE OF THIS AGREEMENT SHALL BE CONTROLLED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA.

§11.9 <u>NECESSARY MODIFICATION</u>: IN THE EVENT ANY PROVISION OF THIS AGREEMENT IS FOUND TO BE INVALID, CONTRARY TO, OR IN CONFLICT WITH ANY APPLICABLE PRESENT OR FUTURE LAW OR REGULATION IN A FINAL RULING BY ANY COURT, AGENCY OR TRIBUNAL POSSESSING COMPETENT JURISDICTION, THIS AGREEMENT SHALL BE DEEMED MODIFIED TO THE EXTENT NECESSARY TO CONFORM WITH ANY SUCH RULING, LAW OR REGULATION.    THE REMAINDER OF THIS AGREEMENT SHALL NOT BE AFFECTED THEREBY AND SHALL REMAIN IN FULL FORCE AND EFFECT.

§11.10 <u>COUNTERPARTS</u>: THIS AGREEMENT MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH SHALL BE DEEMED AN ORIGINAL, AND ALL OF WHICH SHALL CONSTITUTE ONE AND THE SAME INSTRUMENT.

§11.11 <u>TIME CALCULATION</u>:    IN COMPUTING THE NUMBER OF DAYS FOR PURPOSES OF THIS AGREEMENT, ALL DAYS SHALL BE COUNTED, INCLUDING SATURDAYS, SUNDAYS, AND HOLIDAYS; PROVIDED, HOWEVER, THAT IF THE FINAL DAY OF ANY TIME PERIOD FALLS ON A SUNDAY, OR HOLIDAY, THEN THE FINAL DAY SHALL BE DEEMED TO BE THE NEXT DAY WHICH IS NOT A SUNDAY OR HOLIDAY.

§11.12 <u>DAMAGES</u>:    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY

BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT OR SPECIAL DAMAGES, INCLUDING LOST PROFITS AND PUNITIVE DAMAGES.

§11.13  NO JURY TRIAL: THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON OR ARISING OUT OF THIS AGREEMENT OR ANY ACTS, OMISSIONS, TRANSACTIONS OR COURSE OF DEALING HEREUNDER.

IN WITNESS WHEREOF, BFBD AND DISTRIBUTOR HAVE CAUSED THIS AGREEMENT TO BE DULY EXECUTED AS OF THE DAY AND YEAR FIRST ABOVE WRITTEN.

BIMBO FOODS BAKERIES
DISTRIBUTION INC. (BFBD)


BY: _____          _____
SHELLY W. SELIGMAN                                      DISTRIBUTOR
VICE PRESIDENT

# Exhibit B

## EXHIBIT B(4)

## BIMBO FOODS BAKERIES DISTRIBUTION, INC.
## ASSIGNMENT OF RECEIVABLES

I,_____, HEREBY AUTHORIZE BFBD TO DEDUCT EACH WEEK FROM MONIES IT OWES ME AS A RESULT OF ITS PURCHASE FROM ME OF CERTAIN ACCOUNTS RECEIVABLE, THE FOLLOWING:
**PLEASE INITIAL APPLICABLE BOXES:**

AN AMOUNT SUFFICIENT TO ENABLE THE PAYMENT, ON A MONTHLY BASIS, OF MY OBLIGATION TO ADVANTAFIRST CAPITAL FINANCIAL SERVICES, INC. UNDER A CERTAIN PROMISSORY NOTE RELATIVE TO THE PURCHASE OF MY DISTRIBUTORSHIP AND RELATED ASSETS.

AN AMOUNT SUFFICIENT TO ENABLE THE PAYMENT, ON A MONTHLY BASIS, OF MY OBLIGATION TO **DISTRIBUTION SERVICES OF AMERICA, INC. (DSA)** UNDER A CERTAIN PROMISSORY NOTE RELATIVE TO THE REQUIRED DOWN PAYMENT ON THE PURCHASE OF MY DISTRIBUTORSHIP AND RELATED ASSETS.

AN AMOUNT SUFFICIENT TO ENABLE THE PAYMENT, ON A MONTHLY BASIS, OF MY OBLIGATION TO **ALLSTATE INSURANCE COMPANY** FOR THE PURCHASE OF THE INSURANCE I AM REQUIRED TO MAINTAIN PURSUANT TO THE SECURITY AGREEMENTS.

AN AMOUNT SUFFICIENT TO ENABLE THE PAYMENT, ON A MONTHLY BASIS, OF MY VEHICLE LEASE PAYMENT OBLIGATION TO **B&G LEASING** PURSUANT TO THE LEASE AGREEMENT PREVIOUSLY EXECUTED BY ME.

I UNDERSTAND THAT BFBD IS NOT OBLIGATED TO MAKE SUCH DEDUCTIONS NOR TO PAY ANY OBLIGATIONS FOR ME OR ON MY BEHALF AND SHALL HAVE NO OBLIGATION TO ME IN CONNECTION WITH THIS AUTHORIZATION EXCEPT TO ACCOUNT TO ME FOR MONIES ACTUALLY DEDUCTED.

I FURTHER UNDERSTAND THAT THE AUTHORIZATION TO DEDUCT FOR MY LOANS/LEASE IS A CONDITION OF ADVANTAFIRST CAPITAL FINANCIAL SERVICES, INC.'S, DSA'S AND B&G LEASING'S CONSENT TO MAKE THE LOANS/LEASE AND MAY

NOT BE TERMINATED BY ME, BUT THAT THE AUTHORIZATION TO DEDUCT FOR MY INSURANCE PAYMENTS IS OPTIONAL AND MAY BE TERMINATED BY ME AT ANY TIME ON 30 DAYS WRITTEN NOTICE.

**EFFECTIVE DATE:** _____

*[Rest of Page Intentionally Left Blank]*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LEROY PRITCHARD; ANTHONY LEGARE;                :
and STEVEN AUSTIN, on behalf of themselves      :
and others similarly situated,                  :      Case No. _____
                                   Plaintiffs,  :
                                                :
                        v.                      :
                                                :
BIMBO BAKERIES USA, INC. and BIMBO              :
FOODS BAKERIES DISTRIBUTION, LLC,               :
                                                :
                                   Defendant.   :
                                                :
                                                :

## CONSENT TO BECOME PARTY PLAINTIFF

I hereby consent, pursuant to Section 16(b) of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 216(b), to become a party plaintiff in the accompanying

FLSA action.  I understand that I will be bound by the judgment of the Court on all

issues in this case.

_____
Signature

_____
Name (Please Print Clearly)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LEROY PRITCHARD; ANTHONY LEGARE;
and STEVEN AUSTIN, on behalf of themselves
and others similarly situated,

:
:
:
:

                                Plaintiffs,

:   Case No. _____

         v.

:
:

BIMBO BAKERIES USA, INC. and BIMBO
FOODS BAKERIES DISTRIBUTION, LLC,

:
:
:

                           Defendant.

:
:
:
:

## CONSENT TO BECOME PARTY PLAINTIFF

      I hereby consent, pursuant to Section 16(b) of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 216(b), to become a party plaintiff in the accompanying

FLSA action.  I understand that I will be bound by the judgment of the Court on all

issues in this case.

_____
Signature

_____
Name (Please Print Clearly)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEROY PRITCHARD; ANTHONY LEGARE; and STEVEN AUSTIN, on behalf of themselves and others similarly situated, | : : : : | |
| Plaintiffs, | : | Case No. _____ |
| v. | : : | |
| BIMBO BAKERIES USA, INC. and BIMBO FOODS BAKERIES DISTRIBUTION, LLC, | : : : | |
| Defendant. | : : : | |

## CONSENT TO BECOME PARTY PLAINTIFF

I hereby consent, pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), to become a party plaintiff in the accompanying FLSA action.  I understand that I will be bound by the judgment of the Court on all issues in this case.

_____
Signature

LEROY PRITCHARD
_____
Name (Please Print Clearly)